25 C.C.P.A.(Patents)

## In re MERZ.
## Patent Appeal No. 3973.

Court of Customs and Patent Appeals.
June 27, 1938.

Ellis S. Middleton, of New York City, and Walter M. O'Brien, of Washington, D. C., for appellant.

R. F. Whitehead, of Washington, D. C. (Howard S. Miller, of Washington, D. C., of counsel), for Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

BLAND, Associate Judge.

A number of claims relating to a process for purifying ultramarine having been allowed by the Primary Examiner of the United States Patent Office, appellant has appealed here from the decision of the Board of Appeals affirming that of the examiner in rejecting claims 7 and 20 to 23, inclusive, which relate to the article, ultramarine, when produced by the said process. Appellant's application teaches a method of purifying ultramarine which contains floatable dirt, including carbon and sulphur, by a flotation process in which the mass is made into a pulp and subjected to flotation operation in the presence of a reagent which has a selective affinity for the dirt or impurity.

Claims 7, 20, and 22 are regarded as illustrative and follow:

"7. As an article of manufacture, artificial ultramarine containing non-floatable impurities having substantially the properties of a product prepared according to the method of claim 3."

"20. As an article of manufacture, artificial ultramarine containing non-floatable impurities substantially free from color dulling floatable impurities."

"22. As an article of manufacture, artificial ultramarine containing non-floatable impurities having improved brightness of shade in all particle sizes over material of the same size produced by levigation methods, said ultramarine being substantially free from color dulling floatable impurities."

Claim 7 was rejected by the examiner "as being an improper type of product claim and on the ground that the product produced is not patentable." He rejected claims 20 to 23, inclusive, on the ground that the product was not patentable over the unpurified product and on the further ground that "they define by the use of negative limitations." The examiner in discussing the question stated that claim 7 violated the well-known rule that "a claim to a new product cannot be claimed by the process of making it unless there is no other way of defining the product."

Concerning the claims which call for artificial ultramarine containing non-floatable impurities, the examiner said that this limitation was not supported by the original specification which makes no mention of the presence of these impurities but states that the process removes substantially 100 per centum of the so-called dirt. He pointed out that claims 20 to 23, inclusive, also seek to define the product by stating that they do not contain floatable ingredi-

ents. The absence of such floatable ingredients, the examiner points out, is the result of appellant's process and, therefore, the claims are objectionable as defining the article by the process of purification.

The examiner stated that the major question in the case was whether or not the product was patentable, and on this phase of the case said:

"The major question in the case is whether or not the product is patentable. Applicant has taken an old product, either naturally or synthetically produced, and removed the impurities therefrom. The first question is one of fact as to the character of the product produced and the second and most important question is, as matter of law, did it require invention independent of the method to discover this product?"

The examiner further stated:

"The examiner has held that regardless of the superior properties of the product over that previously produced by levigating artificial ultramarine, they are not such as to take the case out of the general rule as set forth in the following case; that a product which has been purified is not patentable over the unpurified product.

"Artificial ultramarine is a well known synthetic reproduction of the ultramarine of nature. The product has been created by both nature and man. The applicant has merely pointed out the properties of a purified product. The claims call for a product free from impurities which will float. Whether an impurity will float or not is not an absolute condition. A substance will float when its surface conditions are such that water will not displace air from the surface. The surface conditions are modified by a large number of factors. Practically all substances can be subjected to conditions of surface which will cause them to float. The claim, therefore, calls for a pigment containing the coloring ingredient of ultramarine in a substantially pure state. The coloring ingredients are natural products. These ingredients were well known long before applicant's entry into the art. He has merely purified them. No sound basis of distinction between the purification of elements, such as were present in the cases of General Electric Co. v. De Forest Radio Co., 3 Cir., 28 F.2d 641, and In re Marden and Rich, Cust. & Pat. App., 47 F.2d 958, 1931 C.D. 352, or the purified natural product hor-ome which were involved in Ex parte Eldred, 1,978,079,[1] and Ex parte Lautewschlager, 1,940,174[1] or the manufactured abrasive in In re Ridgway, Cust. & Pat.App, 76 F. 2d 602, 1935 C.D. 533, and the purified natural or artificially produced coloring ingredient of ultramarine.

"Even if applicant has removed only a portion of the impurities, the impure product remaining is not such as will have any unusual functions within the dicta in General Electric Co. v. De Forest Radio Co., supra."

Upon appeal to the board it stated:

"The treatment of artificial ultramarine by flotation seems to be new with appellant and the examiner has allowed claims in process form. As to the claims on appeal, it is the examiner's view that they cover nothing more than a known product which has been purified and hence not patentable over the unpurified product. The claims on appeal are also held to be formally objectionable. Claim 7 attempts to define the characteristics of appellant's product by comparison with the product made by appellant's method as stated in claim 3. This is an indirect attempt to define the product by the method of making the same. As a general proposition, it has frequently been held that a product should not be defined by the method of making where it is possible to define the same in any other way and especially where the method employed cannot be determined from inspection of the article. We agree with the examiner that claim 7 is not in good form.

"As to the remaining claims, it is the examiner's view that they are not fully supported by the specification as filed in that there is no teaching in the specification that the finished product contains nonfloatable impurities. Inasmuch as the purification process employed involves flotation, it may be inferred that the impurities, if any, remaining in the product would be of a non-floatable type. In this connection and in connection with a second limitation of the claims that floatable impurities have been removed, the examiner points out that the impurities removed and hence those remaining will depend to a considerable extent at least on the character of the flotation agent used. Because of this fact and because of the fact that

---

[1] No opinion for publication.

---

the claims specify no particular flotation agent, it is the examiner's view that they are indefinite as definitions of a particular product. We think this view also is sound.

"As a general proposition we think the examiner's holding that mere purification of known materials does not result in a patentable product is proper. In some cases claims have been allowed and sustained for a product which resulted from the purification of a previously known product but as pointed out by the examiner, the product obtained in such a case had properties and characteristics which were different in kind from those of the known product rather than in degree. In the present case the material produced has no new utility imparted to it but is merely of a superior quality because of the removal of materials which tend to somewhat dull the color of the known product."

We are in agreement with the decision of the board which affirmed that of the examiner. We see nothing inventive in producing an artificial ultramarine which contains non-floatable impurities. Appellant's process was not designed to make the impurities non-floatable nor is any advantage shown in having the product contain non-floatable impurities. Moreover, claim 7 is objectionable for the reason assigned by the examiner to the effect that it defines the product by the process by which it was made.

We are in agreement with the tribunals below in their holdings that while appellant may be entitled to a patent on a method for purifying an ultramarine either artificial or natural, he is not entitled to a patent on the article which after being produced has a greater degree of purity than the product produced by former methods. This general rule is a well-settled one, but like all other rules it has an exception. The exception is that if the process produces an article of such purity that it differs not only in degree but in kind it may be patentable. If it differs in kind, it may have a new utility in which invention may rest.

Appellant has stressed and relies largely upon the celebrated "aspirin" case—Farbenfabriken of Elberfeld Co. v. Kuehmsted, C.C., 171 F. 887. The validity of the claim of the Hoffman patent, No. 644,077, was involved in that suit. The claim called for acetyl salicylic acid as a new article of manufacture. Hoffman, the inventor, discovered a new method of purifying this acid and when purified it became a very valuable (and in a patent sense a new) material used extensively for medicinal purposes for which it was in no sense suitable prior to its purification. The facts in that case are very different from the facts at bar. No new use is claimed for appellant's purified ultramarine. It is the same old ultramarine with the same old use though it may have brighter color and be more desirable as a pigment than formerly.

We are in agreement with the decision of the Board of Appeals for the reasons stated and the same is affirmed.

Affirmed.