**MERCK & COMPANY, Inc.,**

v.

**OLIN MATHIESON CHEMICAL CORP.**

Civ. A. No. 742.

United States District Court
W. D. Virginia
Roanoke Division.

May 3, 1957.

Woods, Rogers, Muse & Walker, Roanoke, Va., and Stephen H. Philbin (of Fish, Richardson & Neave), New York City, for plaintiff.

Penn, Stuart & Phillips, Abingdon, Va., and John T. Kelton (of Watson, Leavenworth, Kelton & Taggart), New York City, for defendant.

PAUL, Chief Judge.

This is an action for the alleged infringement of a patent, No. 2,703,302, issued March 1, 1955 on an application dated December 8, 1952. The plaintiff holds the patent as assignee of Edward L. Rickes and Thomas R. Wood, the claimed inventors.

The patent is entitled as relating to "Vitamin B12-Active Composition and Process of Preparing Same", and its object is stated in the patent as follows:

"This invention is concerned generally with the production of valuable vitamin products by fermentation. More particularly, it relates to vitamin B12-active concentrates which possess animal protein factor (APF) activity, and which can be characterized by their property of promoting the growth of the microorganism *Lactobacillus lactis* Dorner (LLD), and to methods for producing such vitamin B12-active, APF-active and LLD-active materials utilizing selected strains of microorganisms belonging to the subphylum Fungi. These vitamin B12-active concentrates are valuable as feed supplements and for the treatment of nutritional diseases."

The patent contains twelve claims, three of these being product claims and the remaining nine being for the processes by which these products are obtained. The patent sets forth a number of examples to illustrate the carrying out of the invention with varying materials and treatment. The complaint when filed charged infringement of all claims of the patent but, as the result of information developed by pre-trial interrogatories, the plaintiff decided not to press its charge of infringement as to the process claims. The action is, therefore, concerned only with the product claims, which are claims Nos. 1, 2 and 3 of the patent.

Of the claims which are now charged to be infringed (the product claims) claim No. 1 reads:

"A vitamin B12-active composition comprising recovered elaboration products of the fermentation of a vitamin B12-activity producing strain of Fungi selected from the class consisting of Schizomycetes, Torula, and Eremothecium, the L.L.D. activity of said composition being at least 440 L.L.D. units per milligram and less than 11 million L.L.D. units per milligram."

Claims 2 and 3 differ from claim 1 merely by specifying in claim 2 a minimum L.L.D. activity of 1500 L.L.D. units per milligram, and in claim 3 a minimum of 65,000 L.L.D. units per milligram.

The alleged infringing articles are manufactured and sold by E. R. Squibb & Sons, a well-known pharmaceutical concern, which is now a division of the defendant corporation. The defenses to the action are the usual ones of invalidity of the patent and non-infringement.

To a clear understanding of the effect of the patent in suit and of the issues involved in the case some recital of the history leading to the issuance of the patent is desirable. This is to be gleaned from recitals in the patent, testimony in the case, and statements as to which counsel are in agreement.

For some years prior to the application for this patent it had been known to the

medical world that persons suffering from pernicious anemia were benefitted by a diet containing a substantial amount of liver; that there was some element, factor, or substance in the liver of certain animals, notably cattle, that was effective in the treatment of this disease. It is agreed that this discovery was made and publicized by Drs. Minot and Murphy of the Harvard Medical School in the year 1926.

It had also been known for a long time that poultry feeds composed only of plant materials such as cereal grains, alfalfa and the like were lacking in some factor or material conducive to developing healthy and fast-growing flocks and to obtaining a high percentage of fertility in the eggs. This factor, known as the "animal protein factor" (APF), must be supplied in some way in order to avoid a high rate of mortality among the young chicks and to attain a maximum rate of growth. Consequently the commercial producers of poultry feeds have for years been supplying this animal protein factor in their feeds in the form of meat scraps, fish meal, liver meal and like materials which provide it. It had been found out also, at least several years before the alleged invention of Rickes and Wood (which is alleged as in the latter part of 1947), that poultry feed mixtures containing dried cow manure or the dried contents of the rumen were noticeably efficient in promoting the growth and health of young chickens. (The rumen is defined as the first stomach of the ruminant, or cud-chewing animals.) In 1942 John C. Hammond of the U. S. Department of Agriculture had published an article in Poultry Science relating to cow manure as a source of vitamins for growing chickens, and in 1944 the same author published in the same journal an article setting out the nature of his experiments with dried cow manure and dried rumen contents as an ingredient of chicken feeds and their effect in promoting the growth of young chickens. Therefore, at least as early as 1944 it was known that there was in dried cow manure and dried rumen a factor or sub-

stance now referred to as the animal protein factor and that this same substance, or something producing the same results, was present in liver meal.

Following the discovery in 1926 of the beneficial effects of liver in the treatment of pernicious anemia various pharmaceutical laboratories engaged in the manufacture of liver extracts and concentrates for use in treatment of the disease, and for some years these were the accepted, and apparently the only, remedies known to the medical profession. Sometime later various research chemists became engaged in investigations to determine the nature of the efficient factor in liver and to isolate it. In 1945 there was published a lengthy article compiled by Dr. Y. Subbarow, Research Director of the Lederle Laboratories, and others, which stated its purpose to be "the presentation of the progress made since 1926 toward the isolation and identification of the anti-pernicious anemia material of liver." This lengthy article reviews various experiments, theories and tests conducted by a number of scientists from 1926 on, including those of the authors. It concluded with the statement that "It is, unfortunately, apparently not possible at the present time to reconcile the various claims and facts regarding the material or materials which are present or capable of extraction from liver, and which are therapeutically active in pernicious anemia."

It was in June, 1946, that Dr. Wood, one of the patentees of the patent in suit, became employed by Merck as a research chemist and he states that one of his first assignments was to begin work on the so-called anti-pernicious anemia factor in liver. Knowing that liver and liver extracts were beneficial in the treatment of pernicious anemia it appears to have been the object of Dr. Wood's research to identify and isolate the substance in liver which was responsible for this effect and which at this time seems to have been designated merely as the "anti-pernicious anemia factor." Dr. Wood was assisted in his investigation by Edward L. Rickes, another chemist employed by plaintiff.

It appears that Dr. Mary Shorb, a bacteriologist employed by the United States Department of Agriculture from some time in 1944 until August, 1946, had, during that period, conducted experiments designed to develop a microbiological assay for the nutritional factor in liver. She found that the microorganism Lactobacillus lactis Dorner would, in the presence of tomato juice, respond to a substance in liver extracts which she termed the LLD factor. Dr. Shorb first published a brief article touching her research in January, 1947. In May, 1947, she published a further article in the Journal of Bacteriology disclosing further results of her experiments and containing a tabulation showing the results of the application of her assay procedure to liver extracts. At this time she was with the Department of Poultry Husbandry at the University of Maryland.

The work done by Dr. Shorb, as well as her testimony concerning it, is of such a technical nature that it is difficult for the lay mind to evaluate accurately the nature and extent of her contribution to the problem of identifying and isolating the anti-pernicious anemia factor. There is no doubt, however, that her discoveries were important and valuable to the plaintiff here. In fact, when Merck learned early in 1947 of the work being done by Dr. Shorb it entered into an agreement with the University of Maryland (where Dr. Shorb was working) dated February 1, 1947, which they termed a cooperative agreement, and which, after reciting the mutual interest of the parties in promoting research on vitamins, stated the purpose of the agreement to be "To study an unidentified factor in liver which replaces pantothenic acid in the nutrition of the chick and to study a possible assay for the anti-pernicious anemia factor." This contract as originally entered into was to cover a period of three months—or until May 1, 1947. (At the expiration of that time the contract was amended to run until January 31, 1948, but it is not made clear as to what contribution to the work was made by Dr. Shorb during the extended period.)

Pursuant to the contract Dr. Shorb, in her laboratory at the University, conducted assays on various samples provided by Merck and reported to that company the results of her tests. On April 25, 1947, Dr. Shorb sent to Dr. Folkers, head of Merck's research laboratory, the draft of a paper which she had prepared as the result of her studies and experiments and which was intended for later publication. An accompanying letter to Dr. Folkers pointed out that the paper "gives the details of the assay method for the LLD (PA) factor." The Shorb assay procedure furnished a method for testing fermentation sources for the presence of Vitamin B12 activity. Dr. Wood states that when he learned of the Shorb assay procedure (referred to as the LLD assay) he decided to survey sources other than liver for LLD activity, particularly fermentation derived materials. Work along this line seems to have been begun in July, 1947.

As early as June 10, 1947, Wood and Rickes, who until then had been working on liver, succeeded in obtaining liver concentrates of varying degrees of potency ranging as high as 99,000 LLD units per milligram. This was prior to the time when they started the testing of fermentation sources. After they began experimentation with materials derived from fermentation in July, 1947, others in the laboratory continued their work with the liver extracts in an effort to concentrate further or to isolate the anti-pernicious anemia element therein. Utilizing Dr. Shorb's LLD assay procedure on various fermentation sources Wood and Rickes succeeded in December, 1947, in obtaining a crystalline substance to which they gave the name Vitamin B12, and to which they arbitrarily assigned an LLD activity of 11 million LLD units per milligram as representing pure vitamin B12. This was the goal for which Wood and Rickes had been striving, namely, the isolation in pure form of the active material representing the anti-pernicious anemia factor. It is claimed that the products which are involved in the patent in suit, and which are con-

centrates containing varying degrees of LLD activity, were first produced in September, 1947. It would seem that these concentrates (the products in suit) were arrived at along the road leading to isolation of the pure product.

About a week after Wood and Rickes had obtained from the fermentation sources the crystalline material to which they gave the name vitamin B12 other chemists in the Merck laboratory obtained crystals from a liver source. These crystalline materials obtained from these different sources were found to be identical.

On April 10, 1948, Wood and Rickes filed an application for a patent (Serial No. 20,356) for "Chemical Compounds and Processes of Preparing the Same", covering claims for the product Vitamin B12 and for processes for producing it. All claims of the application were rejected and, after unsuccessful attempts to amend, the application was abandoned.

On July 10, 1948, Rickes and Wood filed another application (Serial No. 38,175) for "Chemical Products and Processes of Preparing the Same", containing some 16 claims for a material adapted for the enrichment of animal feeds deficient in the "animal protein factor", and describing the products variously as "a vitamin material"; "a vitamin product"; "a solid vitamin concentrate." There were also a number of process claims. In spite of several amendments all claims were rejected and, after taking an appeal, it was withdrawn and the application abandoned.

On August 4, 1949, Rickes and Wood filed an application (Serial No. 110,222) which contained 5 product claims and 18 process claims. The product claims were for "vitamin B12 Concentrates" and for "red needle-like crystals" resulting from designated processes. This application stated that it was a continuation in part of the abandoned applications Serial No. 20,356 and Serial No. 38,175, which have been referred to above. After lengthy proceedings in the Patent Office all product claims were rejected and a patent (No. 2,695,862) finally issued Novem-

ber 30, 1954, covering 9 process claims only.

The application for the patent in suit was not filed until December 8, 1952. As filed it was for improvements in "Chemical Products and Processes of Preparing the Same" and was alleged to be a continuation in part of the three applications (two abandoned) mentioned above. It contained 36 claims of which 26 were for products variously named "animal feed supplement"; "concentrate of elaboration products of fermentation"; "animal feed composition." There were 10 process claims. After the rejection of most of the original claims followed by various amendments thereof the patent finally issued March 1, 1955, covering 3 product claims and 9 process claims. It is the three product claims only which are in issue here.

It may be noted that Rickes and Wood, on an application dated August 4, 1949, were issued Patent 2,563,794 for Vitamin B12, dated August 7, 1951, as to which counsel disclaim any pertinency to the present case.

The defendant attacks the validity of the patent on numerous grounds and also denies infringement. Among the grounds on which invalidity is asserted are that the subject matter was known and used by others in this country before the asserted invention thereof by the patentees (35 U.S.C.A. § 102); that the differences if any, between the claimed subject matter and the prior art are such that the claimed subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art (35 U.S.C.A. § 103). An additional ground of attack is that the products claimed are unpatentable for the reason that they are products of nature.

██ I cannot escape the view that the patent is invalid as covering a product of nature. At the risk of repetition I think it helpful to again refer, briefly and with the avoidance of technical language as far as possible, to the course of events leading to this patent. It was known as early as 1926 that there was in liver,

particularly that of cattle, some substance—or material or factor, call it what you will—that was beneficial in the treatment of pernicious anemia. It was also known that a healthy and maximum growth in young chickens was promoted by the inclusion in poultry feeds of some material which supplied what was termed the animal protein factor, and that this animal protein factor could be supplied by liver meal, among other things. It was also known, at least long before the invention here claimed, that poultry thrived on feed containing dried cow manure and dried rumen. When it was known that the anti-pernicious anemia factor was found in the liver of cattle and the so-called animal protein factor was also found in the liver as well as in the stomach contents and in the manure of the same animals it seems that it would have been fairly obvious to the scientific mind to conclude, or certainly to suspect, that these beneficent substances were one and the same thing—or at least intimately related.

Knowing that there was in liver some substance beneficial in the treatment of pernicious anemia, the problem was to isolate this substance or to obtain extracts and concentrates which in proper dosage could be administered to patients suffering from the disease. The plaintiff, along with other pharmaceutical manufacturers, embarked on and pursued this effort. Just when it became suspected that the anti-pernicious anemia factor could be derived from fermentation sources is not made clear. It was known in the early 1930's that some vitamins could be obtained from fermentation products; and in 1940 Miner obtained a patent (2,202,161) relating to the recovery from fermentation residues of "compositions containing components of the vitamin B. complex." This patent describes a fermentation process involving the use of bacteria and, in its general outline, not too greatly unlike that described in the patent in suit. And in 1942 an article was published by the University of Texas showing that various B vitamins were present in a number of fermentation sources.

So far as appears Rickes and Wood up until July, 1947, had confined their work to efforts to isolate the anti-pernicious anemia factor in liver. It appears that a few months previously, in May, 1947, Dr. Stokes, of the Microbiological Research Department of Merck, suggested that in the experimental work on the anti-pernicious anemia factor various sources of microbial fermentation be examined. Prior to this Dr. Shorb had disclosed the details of her assay procedure. At the suggestion of Dr. Stokes and with the aid of the Shorb assay method Rickes and Wood proceeded with their investigations with the results already noted. They had in June, 1947, obtained liver concentrates with a potency of 99,000 L.L.D. units per milligram. In September, 1947, they obtained from fermentation sources the concentrates, or compositions, which are the subject of this suit. And in December, 1947, they obtained from both liver and fermentation sources crystalline substances identical in composition and to which they assigned the name Vitamin B12 as representing the unadulterated form of the effective agent which they had been seeking to isolate.

There can be no doubt that the discovery that there could be produced from fermentation sources a substance effective in the treatment of pernicious anemia, which had theretofore been known to exist only in liver, was of great benefit to the medical world. This discovery made possible a practically unlimited supply of something the use of which had theretofore been restricted because of the source of supply and the manner of its administration. And we may even assume, which it is not necessary to decide, that Rickes and Wood, through their knowledge and application, originated the processes by which their results were obtained.

But we are not, in this case, concerned with processes. The claims in litigation are products designated as "Vitamin

B12-active compositions." This means only that they are compounds (or concentrates) containing some proportion of the substance which in its pure form the patentees have named Vitamin B12. (The plaintiff itself states in its brief that "Vitamin B12-active composition means a composition containing Vitamin B12.") And this effective substance, vitamin B12, is admittedly the same as that found in the liver of cattle and which, presumably, has existed in the liver of ruminant animals since they first trod the earth.

Reference has heretofore been made to applications filed by Rickes and Wood, Serial No. 20,356 and Serial No. 110,222. In the first of these, which was abandoned after all claims were rejected, it is noteworthy that one of the reasons for rejection of the product claims (claims 1–3 and 12), which were for "vitamin B12", was because they were "drawn to a product naturally occurring in liver." In Serial 110,222, which resulted in patent 2,695,862 covering process claims only, five product claims were all rejected "as unpatentable over the naturally occurring product, the anti-pernicious anemia principle of liver."

In the original application for the patent in suit all 26 product claims were rejected; 7 of them as lacking invention over the prior art. As to the other 19 the examiner stated: "claims 1 to 18 and 36 are rejected as drawn to a natural product. The vitamin is not a different product inherently in association with various substrates. The vitamin is known to exist in a large number of fermentates as well as liver, whey, fish meal, cow manure, soy bean oil meal * *. The discovery of a vitamin does not form a proper basis for claims covering specific natural materials which include the vitamin." After numerous amendments and much argument all product claims were cancelled and three new claims (Nos. 49 to 51) were submitted. These are the same as those finally granted as claims 1, 2 and 3 now in dispute. These amended claims abandoned the language "A concentrate of elaboration products of

the fermentation of a vitamin B12-activity producing strain of Fungi * * ", and for the first time described the products as "A vitamin B12-active composition comprising recovered elaboration products of the fermentation of a vitamin B12-activity producing strain of Fungi * * * ", with an LLD activity of not less than 440 LLD units per milligram.

It is nowhere indicated what difference the patent office found between "a concentrate of elaboration products" and "a composition comprising recovered elaboration products", derived from the same source by the same method, which rendered the first of them unpatentable as covering a product of nature, yet approved the second. The plaintiff argued before the patent office that the product claims (1, 2, 3) should be allowed because they "define new compositions and not natural products, since none of the products embraced within the scope of those claims existed before applicants' discovery of them." This argument is also urged by counsel for the plaintiff before this court. He says "While it is perfectly true that vitamin B12 may have existed in nature, it never existed in a useful quantity; it existed, measured in LLD units in perhaps 100 or 200 units per milligram, that is, which is a very, very small amount, and the claims all cover an amount of B12 which is much higher than ever could possibly under any conception exist in nature. So the product of the claims themselves never existed in nature, that amount of B12 activity, and you need that amount to be of any value."

The contention is that, while it is conceded that materials containing B12 activity exist in nature, the concentrates produced by the patentees contain a higher degree of B12 activity than exists in any natural material and therefore are not products of nature. I am unable to accept this contention. In passing it may be noted as a striking fact that the product claims in Serial 20,356 and in Serial 110,222 were all for products containing a much higher LLD potency than any natural material, but nevertheless

they were all definitely rejected because they were drawn to a "naturally occurring product, the anti-pernicious anemia factor in liver." And the examiner pointed out that the concentrates described in the application differed merely in degree, and not in kind, from extracts shown in the prior art. In view of this it is difficult to understand why the patent office, on an application filed 3 or 4 years later, approved the product claims of the patent in suit which are simply for concentrates of varying degrees of B12 activity.

In his argument in support of this patent counsel for plaintiff ascribes to Rickes and Wood a degree of inventiveness which does not appear to be borne out by the actual course of events. It may first be said that counsel's statement (hereinbefore quoted) that vitamin B12 never existed in nature in any useful quantity or in an amount of any value is not exactly accurate. It had always existed in liver and in 1926 Minot and Murphy had discovered and pointed out its value in the treatment of pernicious anemia in its natural state as a content of liver. It is true that at that time this beneficent substance was known only as the anti-pernicious anemia factor but its value was realized and it is the same substance to which, 21 years later, the patentees gave the coined name vitamin B12.

Again plaintiff argues in this form:

"Before Rickes and Wood, in 1947, no one knew there was such a substance as vitamin B12, no one knew what it was in liver that benefitted pernicious anemia patients, no one knew what was the 'animal protein factor' (APF) for animal and chick feed, and no one knew that the anti-pernicious anemia factor was a vitamin or that it could be obtained from fermentation sources."

When analyzed this argument will not stand up. To say that prior to 1947 no one knew there was such a substance as vitamin B12 is to argue in a circle, for the reason that while many persons knew of this unnamed substance and were trying to isolate it, the name vitamin B12 was not given to it until after it had been isolated. To say that no one knew what the anti-pernicious anemia factor or the animal protein factor was means only that no one had been able to isolate it. To say that no one knew that the anti-pernicious anemia factor was a vitamin is an equally illusory argument. The word "vitamin" was not known in the English language until well into this century. Dictionaries published as late as 1933 list it among "new words" and not until 1935 or later was it included as an established word in the language. It is a coined word and is defined in Webster's International Dictionary (published 1943) as

"Any of a group of constituents of most foods in their natural state, of which very small quantities are essential for the normal nutrition of animals, and possibly plants.

"The vitamins are recognized by the effect produced on animals when their diets are deficient in these substances  *  *  *."

With the knowledge that chemists possessed as to the nature and effect of the anti-pernicious anemia factor long prior to 1947 and in view of the definition of a vitamin, it would seem that Rickes and Wood in 1947 knew that the substance they were investigating was a vitamin of some classification. After isolating it they gave it the name vitamin B12. They classed it as a "B" vitamin because it was soluble in water, the characteristic of the B classification, and they assigned it the number 12 because that was the next available number in the B classification.

Put in brief and simple terms, what Rickes and Wood did was this. They knew that the anti-pernicious anemia factor existed in liver and they, along with many others, had already produced extracts or concentrates of liver containing a much higher degree of anti-pernicious anemia potency than is contained in liver in its natural state. While some of their colleagues continued the effort to isolate the anti-pernicious anemia sub-

stance in liver in its pure state, Rickes and Wood undertook the same work on fermentation sources. Both efforts were finally successful and the pure anti-pernicious anemia substances obtained from both sources were found to be the same. And just as the production of concentrates of liver preceded the isolation of the pure substance (now called vitamin B12) from that source, so did Rickes and Wood, in the course of their work with fermentation sources, produce concentrates of varying potency before arriving at the isolation of pure vitamin B12. It would seem that in seeking to isolate some sought-for substance it is a common occurrence that the final result is preceded by obtaining a succession of concentrates each showing an increasing proportion of the substance sought for. It is these concentrates on which the patent was granted.

These concentrates may be very crude as compared to pure vitamin B12. Claim 1 is for a compound containing at least 440 LLD units per milligram. This represents a composition which may have a purity in terms of vitamin B12 of only .004 of 1%, or, in other words is composed of 99.996% impurities. The patentees have sought to cover the entire field of fermentation products from those containing as little as .004 of 1% of vitamin B12 up to the pure product. And, as before stated, their reason for this is their claim that even this lower limit represents a product with a higher content of vitamin B12 than can be found in nature.

■ It has long been settled that a patent cannot be had on a product occurring in nature, even though it be obtained from sources and by processes not previously utilized. The leading and most frequently cited case emphasizing this appears to be American Wood-Paper Co. v. Fibre Disintegrating Co., usually referred to as the Wood-Paper Patent Case, reported in 23 Wall. 566, at pages 593-594, 23 L.Ed. 31, in which we find the following language:

"It is quite obvious that a manufacture, or a product of a process,

may be no novelty, while, at the same time, the process or agency by which it is produced may be both new and useful—a great improvement on any previously known process and, therefore, patentable as such. And it is equally clear, in cases of chemical inventions, that when, as in the present case, the manufacture claimed as novel is not a new composition of matter, but an extract obtained by the decomposition or disintegration of material substances, it cannot be of importance from what it has been extracted.

"There are many things well known and valuable in medicine or in the arts which may be extracted from divers substances. But the extract is the same, no matter from what it has been taken. A process to obtain it from a subject from which it has never been taken may be the creature of invention, but the thing itself when obtained cannot be called a new manufacture. It may have been in existence and in common use before the new means of obtaining it was invented, and possibly before it was known that it could be extracted from the subject to which the new process is applied. Thus, if one should discover a mode or contrive a process by which prussic acid could be obtained from a subject in which it is not now known to exist, he might have a patent for his process, but not for prussic acid."

Funk Bros. Seed Co. v. Kalo Co., 333 U.S. 127, 68 S.Ct. 440, 92 L.Ed. 588, involved a patent containing both process and product claims, but where the validity of the latter only was in issue. In holding them invalid the Court said in part (333 U.S. at page 130, 68 S.Ct. at page 441):

"We do not have presented the question whether the methods of selecting and testing the non-inhibitive strains are patentable. We have here only product claims. Bond [the patentee] does not create a state of inhibition or of non-inhibition in the

bacteria. Their qualities are of course not patentable. For patents cannot issue for the discovery of the phenomena of nature. See LeRoy v. Tatham, 14 How. 156, 175, 14 L. Ed. 367."

General Electric Co. v. DeForest Radio Co., 3 Cir., 28 F.2d 641, 642, is an informative case in which the court held invalid certain product claims involving the metal tungsten, the court saying, in part, "even if Coolidge [the patentee] was the first to uncover it and bring it into view, he cannot have a patent for it because a patent cannot be awarded for a discovery or for a product of nature, or for a chemical element."

In re Marden, 47 F.2d 957, 18 C.C.P.A., Patents, 1046, involved a patent on products of the metal uranium. In the course of a brief opinion upholding the rejection of the claims the court says:

"Uranium is a product of nature, and the appellant is not entitled to a patent on the same, *or upon any of the inherent natural qualities of that metal.*" (Emphasis supplied).

Another case under the same style as that just cited related to products of vanadium and is reported as In re Marden, 47 F.2d 958, 18 C.C.P.A., Patents, 1057. In rejecting the applicant's claims of patentability, the court says, in part (47 F.2d at page 959):

"If appellants have invented a new and useful process for producing pure vanadium, they are entitled to their patent monopoly of that process. But pure vanadium is not new in the inventive sense, and, it being a product of nature, no one is entitled to a monopoly of the same.

\*  \*  \*  \*  \*  \*

"Vanadium in composition with other metals has been known to exist by metallurgists for more than a century, having been discovered by Del Rio in 1801 in vanadinite. \* \*

"The *quality* of *purity* of vanadium or its ductility is a *quality of a*

*natural product* and as such is not patentable." Citing General Elec. Co. v. DeForest Radio Co., supra. (Emphasis supplied.)

In the Matter of Merz, 97 F.2d 599, 601, 25 C.C.P.A., Patents, 1314, the court, in referring to the contention that the claimed product had a greater degree of purity than previously known said:

"We are in agreement with the tribunals below in their holdings that while appellant may be entitled to a patent on a method for purifying an ultra-marine either artificial or natural, he is not entitled to a patent on the article which after being produced has a greater degree of purity than the product produced by former methods. This general rule is a well-settled one, but like all other rules it has an exception. The exception is that if the process produces an article of such purity that it differs not only in degree but in kind it may be patentable."

It is obvious that the products of the patent in suit do not come within the exception stated, and that the general rule laid down is applicable here. The plaintiff's products differ merely in degree, and not in kind, from materials occurring in nature and from those produced by others prior to 1947.

One of the inventions made patentable by the terms of the statute, 35 U.S.C.A. § 101, is a new "composition of matter", and it is under this category that the patentees claim here. In 69 C.J.S. Patents § 12, p. 185, this definition occurs.

"A composition of matter is a compound produced or resulting from the intermixture of two or more specific ingredients and *possessing properties different from,* or *in addition to,* those possessed by the several ingredients in common." (Emphasis supplied.)

This definition is that adopted by the courts. See Application of Levin, 178

F.2d 945, 948, 37 C.C.P.A., Patents, 791, and other cases. See also Cochrane v. Badische Anilin & Soda Fabrik, 111 U.S. 293, 4 S.Ct. 455, 28 L.Ed. 433.

■ It seems clear that the products of the patents in suit are not new compositions of matter. They are concentrates derived from fermentation sources and which contain certain proportions of the substance known as vitamin B12 combined with impurities, but they do not possess properties different from their several ingredients.

Whatever may be the composition of the products claimed in the patent it is their content of vitamin B12, and that only, which renders them useful. And because vitamin B12 is a product of nature a patent covering a composition of which it is the only active and useful ingredient is invalid. See cases hereinbefore cited.

While a finding that this patent is invalid might be allowed to rest on the ground heretofore discussed, I am of the further opinion that, in the sense of the patent law, there was a lack of invention on the part of Rickes and Wood. The reasons for this conclusion may be stated very briefly. For some time it had been known that fermentation residues were a source of vitamins and, in particular, that vitamins of the B-complex were derivable from this source. Miner, 1940; University of Texas Publication, 1942; Burkholder, 1944; Novak, 1948 (on application dated 1943). When early in 1947 Dr. Shorb pointed out the relation between LLD and anti-pernicious anemia activity and a method for assaying the anti-pernicious anemia activity of fermentation sources, the task of Rickes and Wood became one of careful, industrious laboratory work with such microorganisms as were selected by them, but did not involve invention on their part.

I find that the patent in suit, as related to claims 1, 2 and 3 is invalid and that the complaint should be dismissed.