**MERCK & CO., Inc., Appellant,**

v.

**OLIN MATHIESON CHEMICAL CORPORATION, Appellee.**

No. 7473.

United States Court of Appeals Fourth Circuit.

Argued Oct. 18, 1957.

Decided March 3, 1958.

noke, Va., Frank W. Rogers, Roanoke, Va., E. Cummings Sanborn, Frank M. Nolan, New York City, on brief), for appellant.

John T. Kelton, New York City (William A. Stuart, Abingdon, Va., Leonard A. Watson, Elmer R. Helferich, New York City, Robert Alpher, New York City, on the brief), for appellee.

Before PARKER, Chief Judge, and SOBELOFF and HAYNSWORTH, Circuit Judges.

HAYNSWORTH, Circuit Judge.

This is a suit upon the product claims of patent No. 2,703,302, entitled "Vitamin $B_{12}$-Active Composition and Process of Preparing Same," issued to Rickes and Wood, assignors of the plaintiff, Merck, on March 1, 1955, upon an application dated December 8, 1952[1]. The District Court held the product claims invalid, upon the grounds that they covered a "product of nature" and that there was lack of invention. Merck & Company, Inc., v. Olin Mathieson Chemical Corp., D.C.W.D.Va., 152 F.Supp. 690.

We are not here concerned with the process claims of the patent, for they were voluntarily withdrawn from the case when it appeared that, while the defendant through its E. R. Squibb & Sons division markets the accused products under the trade name "Rubramin," it purchased the $B_{12}$ active materials from another manufacturer of pharmaceuticals. We are concerned with the three product claims, which are identical except that the minimal active strength is specified in the three claims, respectively, as 440, 1500 and 65,000 LLD units per milligram.

Claim 1 is in the following language:

"1. A vitamin $B_{12}$-active composition comprising recovered elaboration products of the fermentation of a vitamin $B_{12}$-activity producing strain of Fungi selected from the class consisting of Schizomycetes, Torula, and Eremothecium, the L.L.

Stephen H. Philbin, New York City (Woods, Rogers, Muse & Walker, Roa-

---

1. This application was a continuation in part of certain earlier applications stemming from an original application filed April 10, 1948.

D. activity of said composition being at least 440 L.L.D. units per milligram and less than 11 million L.L.D. units per milligram."

In 1926 it was found that pernicious anemia patients were benefited by the addition to their diets of substantial amounts of the liver of cattle. In the succeeding twenty years intensive efforts were made to isolate and identify the substance or substances in liver responsible for the anti-pernicious anemia effect. The search was hampered by the fact that new extracts and concentrates of liver could be tested only by administration to a pernicious anemia patient in relapse. Nonetheless, by 1947 a number of liver extracts and concentrates were available and their relative anti-pernicious anemia potencies had been determined and measured by clinical tests. While those liver preparations were not ineffectual in the treatment of pernicious anemia in most of the cases, they were expensive and some patients were unable to tolerate them.

Though liver fractions of some practical utility had been developed, the medical and scientific worlds remained quite ignorant of the nature of the anti-pernicious anemia principle. There were those who thought it to be a hormone. This seemed logical since it was found in the liver of cattle, and, by definition, a hormone is, while a vitamin is not, produced in the body of the animal. Thus, many believed that pernicious anemia resulted when the individual failed to synthesize the substance within his own body. Others speculated that it might be a vitamin produced by autolysis in the body of the animal after its death. Tests, however, indicated no relation between the liver fractions and vitamins then known. That it could not be a B vitamin was suggested by a test in which the known B vitamins in liver were concentrated, after which the anti-pernicious anemia principle was found to have been left in the filtrate. A group of investigators, observing that continued purification sometimes produced a reduction in potency which could be restored by the addition of inactive materials, concluded that the principle was a combination of several factors or, at least, one primary hematopoietic factor, the activity of which was augmented by the presence of at least three accessory factors. Still others were led by their investigations to conclude that there were two primary factors, one of which, alone, was responsible for the observable reticulocytosis in the patient, while the other, in combination with the first, led to erythropoiesis and the cure of the patient[2]. Most of these divergent theories and opinions were based upon known postulates, and there was support in scientific data for most, or all, of them. Still, no one knew what the substance was. In 1945, Dr. SubbaRow and his associates, after reviewing all of the current learning, could conclude only, "It is, unfortunately, apparently not possible at the present time to reconcile the various claims and facts regarding the material or materials which are present or capable of extraction from liver, and which are therapeutically active in pernicious anemia."

In a quite different field, during the first half of the last decade, a scarcity of alfalfa leaf meal for use as a supplement in poultry feeds prompted a search for substitutes. Experiments revealed that, in sardine fish meal, in dried cow manure and in the dried contents of the rumen of cows, there was an unknown and unidentified nutrient which greatly stimulated the growth of chicks and the efficiency of their feed utilization. It also reduced their mortality. It was established that this "animal protein factor" was not one of the previously known chick growth factors.

It does not appear that the discoverers of the "animal protein factor" experimented with liver or liver products, but

---

**2.** Reticulocytosis, the production of reticulocytes, young red blood cells, was usually observable shortly after administration of the active liver fractions, but not necessarily at the same rate as the subsequently observable erythropoiesis, the production of red corpuscles.

Rickes and Wood recited in their patent that liver meal, among other materials, had been used as an additive in poultry feeds. By 1947, it was also known that chicks on a diet which was deficient in an unknown substance could become anemic. It does not appear, however, that anyone related the anti-pernicious anemia principle to the growth stimulating "animal protein factor," nor had anyone experimenting with the "animal protein factor" isolated, identified or determined the nature of the unknown substance that produced the observed effect.

Dr. Mary S. Shorb, a bacteriologist employed by the Department of Agriculture, undertook the development of an assay, or test, for "Factor X," an unidentified substance in liver which stimulated the growth of rats. She selected for investigation a microorganism, *Lactobacillus lactis,* Dorner, which has high nutritional requirements. She found that the growth of this organism in an amino acid basal medium to which clarified tomato juice had been added was stimulated by the further addition of liver extracts, yeast, orange juice and other substances. Since she did not know the identity of the active principle in either the clarified tomato juice or in the growth stimulants, she referred to them, respectively, as the TJ, or tomato juice, factor and the LLD factor, after the name of the organism she was studying[3]. Experimenting with liver products having determined value in the treatment of pernicious anemia, she observed that the rate of growth of the *Lactobacillus lactis,* Dorner ("LLD activity") varied in an almost linear relation to the established anti-pernicious anemia potencies of the liver products she tested. This led her to speculate that her assay might be useful in determining the presence and strength of the anti-pernicious anemia principle in liver products, but of this she was uncertain since her organism was responsive to materials, other than liver, which did not contain, in fact

or so far as she knew, any anti-pernicious anemia activity.

In the summer of 1946, Dr. Shorb took a position with the University of Maryland where she continued her efforts to perfect her assay. These efforts were directed primarily to the TJ factor. Some tomato juice, even after clarification, was contaminated with LLD activity, so that this factor was at times unstable and produced erratic results. The stabilization of the TJ factor, whatever the identity of the other factor might be, was essential to the validity of her assay.

In February 1947, officials in Merck's research department having learned of the work of Dr. Shorb, a contract was negotiated between Merck and the University of Maryland pursuant to which Dr. Shorb was to continue her efforts to develop and perfect an assay for the anti-pernicious anemia factor. Meanwhile, it was agreed that she would test with her assay procedure, in its then stage of development, such materials as might be submitted to her by Merck. It was also agreed that such patents and patent rights as might result from her work under the contract would be assigned to Merck.

Beginning in 1938, employees in Merck's research laboratories had worked upon the isolation of the anti-pernicious anemia factor in liver. After some years these unsuccessful efforts were abandoned, but were resumed in 1946 under the direction of Dr. Wood, one of the patentees. In May 1947, Dr. Wood assigned Rickes, a chemist working under his supervision, to an investigation of fermentation materials as a possible source of the anti-pernicious anemia factor. A number of fermentation products derived from the growth of several species of microorganisms were investigated. The results were not promising, until on September 16, 1947, there was produced a composition within the terms of claim 1 of the patent. These compositions were obtained in the eluates of the

3. She subsequently identified the TJ factor as pyridoxamine phosphate and the stimulatory factor as calcium and/or the peptide component of casein.

residue in "spent" Norit after elution of the grisein materials which previously had been adsorbed from the acidified broth of the microorganism, *Streptomyces griseus*[4]. While grisein, itself, contains none of the desired activity, there followed an intensive search of grisein materials and experimental extraction, concentration and fractionization to obtain the desired substance. On October 22, 1947, a fraction having a pinkish color was obtained. This color deepened as further concentration and separation were achieved, until, finally, on December 11, 1947, a pure, red, crystalline material was obtained.

A short time thereafter, other employees of Merck, who had continued to work with liver, succeeded in isolating a pure, red, crystalline material which, upon analysis, was found to be identical in chemical structure and function to that obtained from fermentates. Clinical tests proved the material derived from both sources to be the anti-pernicious anemia factor, and chick tests proved it to be an efficient growth stimulant.

After much additional analysis and investigation, officials of Merck decided the pure material could be classified as a vitamin. Since it was water-soluble[5], it was placed in the "B" group and was assigned the number 12, all lower numbers having been appropriated.

The claims of this patent do not reach pure, crystalline vitamin $B_{12}$, for they are restricted to compositions having a maximum LLD activity which is less than that of the pure substance. The claims do not cover vitamin $B_{12}$ compositions derived from liver or any source other than the specified fermentates. Nor do the claims extend to compositions of such low activity as to be of no commercial or therapeutic value. They do cover $B_{12}$-active compositions derived from the specified fermentates, which, beyond question, are of very great therapeutic and commercial importance. They are cheaply and abundantly produced and all toxic and harmful substances eliminated without the necessity of isolating crystalline vitamin $B_{12}$.

The contention that there was lack of invention in the work of the patentees rests principally upon the work of Dr. Shorb. While her assay was responsive to other growth stimulants, its availability unquestionably facilitated the work of the patentees and enabled them to stop short their travel upon many a wrong road. For her provision of a tool of great assistance to them, the patentees must have been grateful to her, but there is nothing to suggest that she ever envisioned anything in the nature of the compositions developed by the patentees, or, indeed, that she ever supposed that anti-pernicious anemia activity might be found in any material other than liver.

Dr. Shorb, in speculating that her assay might be responsive to the anti-pernicious anemia factor in liver, knew it was responsive to some substance or substances in yeast, unclarified tomato juice, orange juice, peptone and many other materials which she, correctly, supposed to contain no anti-pernicious anemia activity. In her search for a stable TJ factor to be substituted for tomato juice, she actually examined fermentation materials. Some of these she found inhibited the growth of *Lactobacillus lactis*, Dorner; others, promoting growth, were found to contain both the TJ factor and LLD activity, but the presence of LLD activity was significant to her only because it required that she discard the ma-

4. As other microorganisms, *Streptomyces griseus*, growing in a nutritional broth, produce elaboration materials. Grisein, a material produced by the growth of *Streptomyces griseus*, may be adsorbed from the acidified broth upon an activated carbon known as "Norit." After removal, by elution, of the adsorbed grisein, a residue of materials was left in the "spent" Norit. When the "spent" Norit was eluted with ethanol or acetone, residual material was removed from the "spent" Norit, and, in the resulting eluate, there was found the desired activity.

5. The B vitamins differ greatly in chemical structure and function. Water solubility is, perhaps, their only common attribute.

terial for further investigation as a substitute for tomato juice. From all that appears, such observation of LLD activity in fermentation materials (as her earlier observation of such activity in yeast, a fermentation product, and other materials) did not produce the faintest notion that the anti-pernicious anemia principle might be present. Such observations were merely a disappointment, marking another failure in her search for a stable TJ factor.

The defendant points particularly to Dr. Shorb's finding of some LLD activity, as well as TJ, in streptomycin culture filtrate, but here she supposed the LLD activity to have been occasioned by the presence of a contaminant, yeast or peptone, in the medium. Had she not attributed such activity to a contaminant, however, there is nothing to suggest that she would have thought such activity of greater significance than similar activity which, when observed in other materials, occasioned their discard.

No support can be found in the record for a finding that Dr. Shorb told anyone, or even thought, that the anti-pernicious anemia principle might be found in fermentation materials. It is conceivable that some other scientist with the knowledge of the day might have found significance in Dr. Shorb's observations, which she overlooked, but the record does not show that anyone did.

The defendant also points to earlier patents and publications showing that other B vitamins had been derived from fermentation materials. The argument is that anyone skilled in the field searching for a new B vitamin would turn to the known sources of other B vitamins. The argument, however, assumes knowledge of which the scientific world was ignorant until the work of the patentees was done. The fact that substances of well known structure and nature may be found in particular material does not necessarily suggest that some other substance of unknown structure and nature is to be found in the same material. The fact is that the anti-pernicious anemia factor was known to exist only in liver. The many scientists, who, in the twenty years following 1926, searched for it, appear to have confined their investigations to liver sources. That they did not turn to fermentation materials is an emphatic answer to the contention that the existence of the factor in those materials was obvious.

The real contention of the defendant, and the primary basis for the conclusion of the District Court, is that the product claims cover a "product of nature," and, for that reason, are invalid. With respect to this defense, the facts are not in doubt, though their complication may have confused the legal considerations.

The substance now known as vitamin $B_{12}$ is produced in minute quantities in the bodies of cattle. It is also produced by certain microorganisms. As found in the liver and the contents of the rumen of cattle it has some therapeutic and commercial value, but the great superiority of the patented compositions is clearly established. This superiority also exists with respect to the liver-derived extracts and concentrates [6]. As found in "natural" fermentates, it has no utility, therapeutically or commercially, until converted into compositions comparable to the patented products.

The Patent Act of 1952 (35 U.S. C.A. § 101), as its predecessors, authorizes a patent for "any new and useful * * composition of matter * * *," provided only that the conditions for patentability, which are specified in succeeding sections, are met. There is nothing in the language of the Act which precludes the issuance of a patent upon a "product of nature" when it is a "new and useful composition of matter" and there is compliance with the specified conditions for patentability. All of the

6. The patented compositions are available in much more abundant supply and, relatively, are cheap. Their potency and dosage may be precisely controlled. They are free of toxic substances and may be readily taken by persons whose idiosyncratic digestions do not permit them to tolerate liver materials.

tangible things with which man deals and for which patent protection is granted are products of nature in the sense that nature provides the basic source materials. The "matter" of which patentable new and useful compositions are composed necessarily includes naturally existing elements and materials.

█ A product of nature which is not a "new and useful * * * machine, manufacture, or composition of matter" is not patentable, for it is not within the statutory definition of those things which may be patented. Even though it be a new and useful composition of matter it still may be unpatentable if the subject matter as a whole was obvious within the meaning of § 103 (35 U.S.C.A. 103), or if other conditions of patentability are not satisfied.

In dealing with such considerations, unpatentable products have been frequently characterized as "products of nature." See Funk Brothers Seed Company v. Kalo Inoculant Company, 333 U.S. 127, 68 S.Ct. 440, 92 L.Ed. 588 (a composite culture of noninhibitive strains of different, but known, species of bacteria); In re Marden, 47 F.2d 957, 18 C.C.P.A., Patents, 1046 (uranium); In re Marden, 47 F.2d 958, 18 C.C.P.A., Patents, 1057 (ductile vanadium); General Electric Co. v. DeForest Radio Co., 3 Cir., 28 F.2d 641 (tungsten). But where the requirements of the Act are met, patents upon products of nature are granted and their validity sustained.

Illustratively, in Parke-Davis & Co. v. H. K. Mulford Co., C.C.S.D.N.Y., 189 F. 95, affirmed 2 Cir., 196 F. 496, the product claims of a patent upon adrenalin were sustained. Adrenalin is a concentrate of the blood pressure raising principle in the suprarenal glands of living animals. It certainly is a product of nature in the sense the $B_{12}$ active compositions here may be said to be products of nature. It was further held that the invention was not anticipated, though the principle was known to exist in the suprarenal glands. Powdered gland tissue, in fact, had been used medicinally, but, as the liver extracts here, its use

was accompanied with such disadvantages that the patented product, free of those disadvantages, was entitled to patent protection.

To the extent that the "product of nature" defense has validity, as urged here, it is a contention that the patented compositions are not "new and useful * * compositions of matter" within the meaning of § 101 of the Act. This defense may be separated into two doctrines, (1) that a patent may not be granted upon an old product though it be derived from a new source by a new and patentable process, and (2) that every step in the purification of a product is not a patentable advance, except, perhaps, as to the process, if the new product differs from the old "merely in degree, and not in kind."

In the first aspect of this defense, reliance is placed upon American Wood Paper Company v. Fibre Disintegrating Company, 23 Wall. 566, 90 U.S. 566, 23 L.Ed. 31, in which a patent upon cellulose produced from wood products was held invalid because cellulose derived from other sources was old and long had been used for paper making, and upon Cochrane v. Badische Anilin & Soda Fabrik, 111 U.S. 293, 4 S.Ct. 455, 28 L.Ed. 433, in which a patent upon synthetic alizarine was held invalid because alizarine, having the same chemical properties and uses, derived from the madder root, had long been known and used in dye-stuff.

It can hardly be doubted that, as was said in "The Wood-Paper Patent case", " * * * if one should discover a mode or contrive a process by which prussic acid could be obtained from a subject in which it is not now known to exist, he might have a patent for his process, but not for prussic acid." The fact that the product, itself, is not a "new and useful * * * machine, manufacture, or composition of matter," within the meaning of § 101, is fatal to the product claims. The facts here, however, are far from the premise of the principle. Until the patentees produced them, there were no such $B_{12}$ active compositions. No one had produced even a comparable product.

The active substance was unidentified and unknown. The new product, not just the method, had such advantageous characteristics as to replace the liver products. What was produced was, in no sense, an old product.

■■ The second aspect of the defense is equally inapplicable to the facts. Each slight step in purification does not produce a new product. What is gained may be the old product, but with a greater degree of purity. Alpha alumina purified is still alpha alumina, In re Ridgway, 76 F.2d 602, 22 C.C.P.A., Patents, 1169, and ultramarine from which flotable impurities have been removed is still ultramarine, In re Merz, 97 F.2d 599, 25 C.C.P.A., Patents, 1314. The fact, however, that a new and useful product is the result of processes of extraction, concentration and purification of natural materials does not defeat its patentability. As was said in the aspirin case, Kuehmsted v. Farbenfabriken of Elberfeld Co., 7 Cir., 179 F. 701, 705:

"Hoffmann has produced a medicine indisputably beneficial to mankind—something new in a useful art, such as our patent policy was intended to promote. Kraut and his contemporaries, on the other hand, had produced only, at best, a chemical compound in an impure state. And it makes no difference, so far as patentability is concerned, that the medicine thus produced is lifted out of a mass that contained, chemically, the compound; for, though the difference between Hoffmann and Kraut be one of purification only— strictly marking the line, however, where the one is therapeutically available and the others were therapeutically unavailable—patentability would follow. In the one case the mass is made to yield something to the useful arts; in the other case what is yielded is chiefly interesting as a fact in chemical learning."

In Union Carbide Co. v. American Carbide Co., 2 Cir., 181 F. 104, 106–107, it was said:

"In determining the question of patentable novelty, there can be no hard and fast rule. Each case must be decided upon its own facts. Mere change of form in and of itself does not disclose novelty. A new article of commerce is not necessarily a new article patentable as such. But patentable novelty in a case like the present may be founded upon superior efficiency; upon superior durability, including the ability to retain a permanent form when exposed to the atmosphere; upon a lesser tendency to breakage and loss; upon purity, and, in connection with other things, upon comparative cheapness. So, as supplementing other considerations, commercial success may properly be compared with mere laboratory experiments."

Judge Learned Hand in Parke-Davis & Co. v. H. K. Mulford Co., C.C.S.D.N.Y., 189 F. 95, 103, stated the principle:

"Nor is the patent only for a degree of purity, and therefore not for a new 'composition of matter.' As I have already shown, it does not include a salt, and no one had ever isolated a substance which was not in salt form, and which was anything like Takamine's. Indeed, Sadtler supposes it to exist as a natural salt, and that the base was an original production of Takamine's. That was a distinction not in degree, but in kind. But, even if it were merely an extracted product without change, there is no rule that such products are not patentable. Takamine was the first to make it available for any use by removing it from the other gland-tissue in which it was found, and, while it is of course possible logically to call this a purification of the principle, it became for every practical purpose a new thing commercially and therapeutically. That was a good ground for a patent."

The Court of Customs and Patent Appeals said in In re Merz, 97 F.2d 599, 601, 25 C.C.P.A., Patents, 1314:

" \* \* \* if the process produces an article of such purity that it differs not only in degree but in kind it may be patentable. If it differs in kind, it may have a new utility in which invention may rest."

Relative to the work of the patentees in this case, the production of amphetamine sulphate from amphetamine with sulphuric acid would seem comparatively simple. No one, before Alles, had produced it, however, and the product was of such value that Judge Biggs, speaking for the Court in Smith, Kline & French Laboratories v. Clark & Clark, 3 Cir., 157 F.2d 725, 729, said:

"While effects may not be claimed, they may not be ignored. For a composition of matter to be patentable it must not only be new it must also be useful. \* \* \* In a patent claiming a new composition of matter the test of usefulness must be found in results, viz., in effects. \* \* That Alles' contribution was of great therapeutic use and value may not be doubted. Following this discovery, physicians had at hand a drug which could affect, even create, mood. Alles' discovery is close to pioneer invention. His patent is entitled to a liberal construction in aid of the claim under consideration. We conclude that the court below committed no error when it found claim 1 of the patent valid."

The compositions of the patent here have all of the novelty and utility required by the Act for patentability. They never existed before; there was nothing comparable to them. If we regard them as a purification of the active principle in natural fermentates, the natural fermentates are quite useless, while the patented compositions are of great medicinal and commercial value. The step from complete uselessness to great and perfected utility is a long one. That step is no mere advance in the degree of purity of a known product. From the natural fermentates, which, for this purpose, were wholly useless and were not known to contain the desired activity in even the slightest degree, products of great therapeutic and commercial worth have been developed. The new products are not the same as the old, but new and useful compositions entitled to the protection of the patent.

For the reasons stated and without resort to the presumption arising from the action of the Patent Office, which was taken only after full consideration of all the matters here relied on by the appellee, we think the invention is meritorious, the product claims of the patent valid and entitled to a liberal construction. That presumption of validity, however, should not be disregarded especially in a case of this sort where the intricate questions of bio-chemistry involved are peculiarly within the particular competence of the experts of the Patent Office. Nor should we overlook the presumptions arising from the fact that the product of the patent filled a long felt want, went into immediate use and promptly displaced the competing liver products. Florence-Mayo Nuway Co. v. Hardy, 4 Cir., 168 F.2d 778, 782. The patentees have given us for the first time a medicine which can be used successfully in the treatment of pernicious anemia, a medicine which avoids the dangers and disadvantages of the liver extracts, the only remedies available prior to this invention, a medicine subject to accurate standardization and which can be produced in large quantities and inexpensively, a medicine which is valuable for other purposes, as well as for the treatment of pernicious anemia. It did not exist in nature in the form in which the patentees produced it and was produced by them only after lengthy experiments. Nothing in the prior art either anticipated or suggested it. The assay of Dr. Shorb, upon which defendant relies, did not anticipate; while it gave the patentees a useful tool for conducting experiments, it did not suggest the product of the patent. As said by the Supreme Court in Diamond Rubber Company v. Consolidated Rubber Tire Company, 220 U.S. 428, 435, 31 S.Ct. 444, 447, 55 L.Ed. 527, 532:

"Knowledge after the event is always easy, and problems once solved present no difficulties, indeed, may be represented as never having had any, and expert witnesses may be brought forward to show that the new thing which seemed to have eluded the search of the world was always ready at hand and easy to be seen by a merely skillful attention. But the law has other tests of the invention than subtle conjectures of what might have been seen and yet was not. It regards a change as evidence of novelty, the acceptance and utility of change as a further evidence, even as demonstration."

As the issue of infringement was not passed upon in the court below, we will not consider it here. The decree of the District Court will be reversed and the case will be remanded for further proceedings not inconsistent herewith.

Reversed and remanded.