MOORE, Circuit Judge,
concurring-in-part.
I join the majority opinion with respect to standing and the patentability of the method claims at issue. I believe, however, that claims directed to isolated DNA sequences present a different set of issues. I join the majority with respect to claims to isolated cDNA sequences, and concur in the judgment with respect to the remaining sequences. I write separately to explain my reasoning.
I.
The Patent Act, 35 U.S.C. § 101, allows “[wjhoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof’ to obtain a patent. The plain language of this statute only requires that an invention be “new and useful,” and fall into one of four categories: a “process, machine, manufacture, or composition of matter.” Congress did not impose any additional constraints on the scope of patentable subject matter. In fact, “Congress intended statutory subject matter to ‘include anything under the sun that is made by man.’ ” Diamond v. Chakrabarty, 447 U.S. 303, 309, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980) (quoting the statutory history).
While the plain language used by Congress did not limit the scope of patentable subject matter in the statute, the “Court’s precedents provide three specific exceptions to § 101’s broad patent-eligibility principles: ‘laws of nature, physical phenomena, and abstract ideas.’” Bilski v. Kappos, — U.S. —, 130 S.Ct. 3218, 3225, 177 L.Ed.2d 792 (2010) (quoting Chakrabarty, 447 U.S. at 309, 100 S.Ct. 2204). These exceptions “rest[], not on the notion that natural phenomena are not processes [or other articulated statutory categories], but rather on the more funda *1359 mental understanding that they are not the kind of ‘discoveries’ that the statute was enacted to protect.” Parker v. Flook, 437 U.S. 584, 593, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978).
Applying the judicially created exception to the otherwise broad demarcation of statutory subject matter in section 101 can be difficult. See Funk Bros. Seed Co. v. Kalo Inoculant Co., 333 U.S. 127, 134-35, 68 S.Ct. 440, 92 L.Ed. 588 (1948) (Frankfurter, J., concurring) (“[Tjerms as ‘the work of nature’ and the ‘laws of nature’ ... are vague and malleable terms.... Arguments drawn from such terms for ascertaining patentability could fairly be employed to challenge almost every patent.”). The analysis is relatively simple if the invention previously existed in nature exactly as claimed. For example, naturally existing minerals, a plant found in the wild, and physical laws such as gravity or E=mc[2] are not patentable subject matter, even if they were “discovered” by an enterprising inventor. Chakrabarty, 447 U.S. at 309, 100 S.Ct. 2204.
Even though an invention did not previously exist in nature in exactly the claimed state, however, does not automatically mean it is patentable subject matter. For example, in Funk Brothers, the Supreme Court held a patent to a combination of multiple naturally occurring bacterial strains was not patentable. Although there was “an advantage in the combination,” which was apparently “new and useful,” none of the bacterial strains “acquire[d] a different use” in combination. Id. at 131-32, 68 S.Ct. 440. The aggregation of the bacterial strains into a single product produced “no new bacteria, no change in the six species of bacteria, and no enlargement of the range of their utility. Each species has the same effect it always had. The bacteria perform in their natural way----They serve the ends nature originally provided and act quite independently of any effort of the patentee.” Id.
In contrast, the Supreme Court held bacteria that included extra genetic material introduced by the inventor were “a nonnaturally occurring manufacture or composition of matter — a product of human ingenuity ‘having a distinctive name, character [and] use’ ” and therefore patentable. Chakrabarty, 447 U.S. at 309-310, 100 S.Ct. 2204 (quoting Hartranft v. Wiegmann, 121 U.S. 609, 615, 7 S.Ct. 1240, 30 L.Ed. 1012 (1887)). Chakrabarty explained that there is no distinction between inventions based on living and inanimate objects for the purpose of the patent statute; instead, the “relevant distinction” for the section 101 analysis is “between products of nature .., and human-made inventions.” Id. at 312-13, 100 S.Ct. 2204. Even if the invention was based on nature, and resulted in a living organism, it may fall within the scope of section 101. For example, “the work of the plant breeder ‘in aid of nature’ was patentable invention” because “ ‘a plant discovery resulting from cultivation is unique, isolated, and is not repeated by nature, nor can it be reproduced by nature unaided by man.’ ” Id. (quoting S.Rep. No. 315, 71st Cong., 2d Sess., 6-8 (1930)). In Chakrabarty, the intervention of man resulted in bacteria with “markedly different characteristics” from nature and “the potential for significant utility,” resulting in patentable subject matter. Id. at 310, 100 S.Ct. 2204.
Funk Brothers and Chakrabarty do not stake out the exact bounds of patentable subject matter. Instead, each applies a flexible test to the specific question presented in order to determine whether the claimed invention falls within one of the judicial exceptions to patentability. Funk Brothers indicates that an invention which “serve[s] the ends nature originally provided” is likely unpatentable subject matter, but an invention that is an “enlargement of *1360 the range of ... utility” as compared to nature may be patentable. 333 U.S. at 131, 68 S.Ct. 440. Likewise, Chakrabarty illustrates that an invention with a distinctive name, character, and use, e.g., markedly different characteristics with the potential for significant utility, is patentable subject matter. 447 U.S. at 309-310, 100 S.Ct. 2204. Although the two cases result in different outcomes, the inquiry itself is similar.
Courts applied an analogous patentability inquiry long before Funk Brothers or Chakrabarty. In one notable case, Judge Learned Hand held that purified adrenaline, a natural product, was patentable subject matter. Judge Hand explained that even if the claimed purified adrenaline were “merely an extracted product without change, there is no rule that such products are not patentable.” Parke-Davis & Co. v. H.K. Mulford Co., 189 F. 95, 103 (S.D.N.Y.1911). This is because “while it is of course possible logically to call this a purification of the principle” the resulting purified adrenaline was “for every practical purpose a new thing commercially and therapeutically.” Id. Similarly, in a case applying the Patent Act of 1952,[1] purified vitamin B-12, another natural product, was also held patentable subject matter within the meaning of section 101. Merck & Co. v. Olin Mathieson Chem. Corp., 253 F.2d 156 (4th Cir.1958). The Fourth Circuit explained that purified vitamin B-12 was “far from the premise of the [naturally occurring] principle.... The new product, not just the method, had such advantageous characteristics as to replace the [naturally occurring] liver products. What was produced was, in no sense, an old product.” Id. at 162-63. These purified pharmaceutical cases are both consistent with Supreme Court precedent: the purified substance was “a new thing ... therapeutically,” Parke-Davis, 189 F. at 103, and had such “advantageous characteristics” that what was produced by purification “was, in no sense, an old product.” Merck, 253 F.2d at 162-63. In other words, the purified natural products were held to have “markedly different characteristics,” as compared to the impure products, which resulted in “the potential for significant utility.” Chakrabarty, 447 U.S. at 310, 100 S.Ct. 2204.
In contrast, mere purification of a naturally occurring element is typically insufficient to make it patentable subject matter. For example, our predecessor court held that claims to purified vanadium and purified uranium were not patentable subject matter since these were naturally occurring elements with inherent physical properties unchanged upon purification. See In re Marden, 18 CCPA 1057, 47 F.2d 958, 959 (1931) (“[P]ure vanadium is not new in the inventive sense, and, it being a product of nature, no one is entitled to a monopoly of the same.”); In re Marden, 18 CCPA 1046, 47 F.2d 957 (1931) (“ductile uranium” not patentable because uranium is inherently ductile). Likewise, claims to purified ductile tungsten were not patentable subject matter since pure tungsten existed in nature and was inherently ductile. Gen. Elec. Co. v. De Forest Radio Co., 28 F.2d 641, 643 (3d Cir.1928). In each of these cases, purification did not result in an element with new properties. Instead, the court held the naturally occurring element inherently had the same characteristics and utility (e.g. ductility) as the claimed invention. Consistent with Funk Brothers and Chakrabarty, the claims all fell within the laws of nature exception.
As illustrated by these examples, courts have long applied the principles articulated *1361 in Funk Brothers and Chakrabarty to different factual scenarios in order to determine whether an invention, as claimed, falls into the laws of nature exception. I see no reason to deviate from this longstanding flexible approach in this case. Keeping these principles in mind, I analyze the isolated DNA claims below, to determine whether they have markedly different characteristics with the potential for significant utility, e.g., an “enlargement of the range of ... utility” as compared to nature. Chakrabarty, 447 U.S. at 309-310, 100 S.Ct. 2204; Funk Bros., 333 U.S. at 131, 68 S.Ct. 440.
II.
The majority conducts a thoughtful analysis of the scientific principles associated with the claims at issue in this case. I write separately here to emphasize certain chemical considerations which I believe are particularly important in this case.
DNA is a chemical polymer. In principle, a polymeric DNA sequence is no different than any other well known polymer, for example, nylon. Like any polymer, DNA is made up of repeating monomer units, connected by chemical bonds to form one larger molecule. In a DNA sequence, the letters A, C, T, and G each represent a different monomer unit; each monomer has a distinct structure, with distinct properties. When they are assembled into a DNA sequence, these monomers are chemically bonded to each other. The process of polymerization of the monomer units— whether carried out by chemical or biological means — results in a new molecule. For example, the sequence A-T-C-G-T represents a single molecule created by polymerizing five monomer units: A, T, C, G, and T again. As illustrated by the figure below, polymerization changes the monomers and results in a molecule with a different ionic charge, different chemical bonds, and a different chemical composition, as compared to the monomers in aggregate.
[[Image here]]
*1362 A-T-C-G-T polymer (left) versus the A, T, C, G, T
aggregated monomers (right)
Deconstructing an existing DNA sequence leads to similar results: a fragment of a DNA sequence has different properties than the parent molecule from which it is derived. For example, as shown below, a two nucleotide sequence (T-C), has a different chemical structure, and different chemical connections than the same subunit found within the larger A-T-C-G-T structure. Despite many similarities, it is impossible to find the isolated T-C structure in the A-T-C-G-T molecule. This is because, instead of being connected to a phosphate, the C subunit terminates in a different functional group, a hydroxyl. Likewise, instead of being connected to another sugar via a phosphodiester bond, the T subunit instead terminates in a phosphate. The isolated T-C sequence is a different molecule than the “T-C” sequence appearing as part of the larger AT-C-G-T polymer. These changes are indicated with arrows below.
[[Image here]]
A-T-C-G-T polymer (left, with T-C highlighted) versus “isolated” T-C molecule (right)
The isolated DNA sequences at issue in this case have the same type of chemical changes, but on a much bigger scale. Instead of a string of five nucleotides, the chromosome is millions of base pairs; instead of a two-monomer molecule, the isolated molecules, claimed in this case range from 15 nucleotides to thousands (or tens of thousands) of nucleotides. Nevertheless, like the simple sequences discussed above, just because the same series of letters appears in both the chromosome and an isolated DNA sequence does not mean they are the same molecule. While the isolated DNA molecules claimed in this case are undoubtedly inspired by the corresponding naturally occurring sequence present on the chromosome, man must create these isolated DNA molecules. *1363 This can be accomplished by building them de novo using chemical or biological means, or by chemically altering the larger polymer to cleave off adjacent portions.
Isolation of a DNA sequence is more than separating out impurities: the isolated DNA is a distinct molecule with different physical characteristics than the naturally occurring polymer containing the corresponding sequence in nature. These differences, of course, are directly related to the change in chemical bonds in the isolated DNA. Instead of being connected to many thousands of additional nucleotides at the 3' and 5' ends of the sequence in question, as is the case in the chromosome, the isolated DNA molecules terminate in, for example, a hydroxyl and a phosphate group, respectively.
There are other differences between an isolated DNA sequence and that same DNA sequence as part of the chromosome. The DNA sequence of a gene, as it occurs in nature, is part of a much larger structure, the chromosome. The claims in suit include DNA sequences as short as fifteen nucleotides, and the isolated BRCA1 cDNA sequence has approximately six thousand nucleotides (see, e.g., '282 col.67-80 (SEQ ID NO: 1)). Both of these are much smaller than the isolated full length BRCA1 gene sequence, which, as discussed below, includes both exon and inferan sequences. Even the isolated BRCA1 gene, however, is substantially smaller than chromosome 17, which includes the unisolated BRCA1 gene as well as many other genes. J.A. 4321. Isolation of a DNA sequence thus results in a substantially smaller molecule compared to the naturally occurring sequence as part of the chromosome.
cDNA, unlike isolated or unisolated DNA, has a unique sequence of DNA bases (A, C, G, T) which is not actually present in nature. While cDNA is derived from RNA, it has a distinctly different sequence of nucleotides, substituting in the complementary nucleotide (swapping G and C, and A and T/U) to form a DNA sequence that is completely different than the corresponding RNA. There is no contiguous sequence on the chromosome that duplicates the cDNA sequence. Moreover, the naturally occurring gene sequence includes both introns (which are removed) and exons (which are included in the mature RNA). The cDNA sequences, which are complementary to the mature RNA, do not include the introns.
[[Image here]]
Schematic illustrating RNA splicing (J.A. 4331)
Creating isolated DNA allows a scientist, among other things, to remove potentially confounding sequences that are naturally present in the larger chromosomal polymer, and instead focus on just the sequence of interest. This aspect of isolated DNA has important practical consequences and leads to additional utility, particularly for the smaller isolated fragments. For example, a small fragment of isolated DNA can be used as a primer in order to selectively detect the presence of the BRCA1 gene or BRCAl gene mutation in a patient. Armed with this scientific background, we can now apply the *1364 principles of Funk Brothers and Chakrabarty to the isolated DNA claims at issue.
III.
The isolated DNA claims of the patents in suit fall into two categories. The first category of claims is directed to isolated sequences that are identical to naturally occurring gene sequences. These include claims encompassing both the isolated full length gene sequence (e.g. claim 1 of '282 patent), which are thousands of nucleotides, and claims to shorter isolated DNA strands, with as few as fifteen nucleotides, whose nucleotide sequence is found on the chromosome (e.g. claim 5 of '282 patent). The second category of claims is directed to isolated DNA sequences that are different from the naturally occurring gene sequences. These include claims to isolated cDNA molecules (e.g. claim 2 of the '282 patent), which differ from the natural gene sequence in that the introns are removed, and are the opposite (complementary) sequence of the naturally occurring RNA.
The cDNA claims present the easiest analysis. Although the plaintiffs (now plaintiff) in the suit argue, and the district court held, that cDNA falls within the “laws of nature” exception to section 101 patentability, I cannot reconcile this argument with the fact that the claimed cDNA sequences do not exist in nature. Moreover, since cDNA has all of the introns removed, and only contains the coding nucleotides, it can be used to express a protein in a cell which does not normally produce it. Of course, the claimed isolated cDNA is inspired by nature — after all, naturally occurring RNA is the template upon which cDNA is constructed. Because it is used as a template, however, cDNA has a complementary sequence of nucleotides, and therefore has a completely different nucleotide sequence than the RNA. Moreover, DNA has a different chemical structure than RNA, including a different base (T instead of U, respectively) and sugar units (deoxyribose instead of ribose, respectively). This results in, among other things, greater stability for the DNA sequence as compared to the RNA sequence.
cDNA sequences thus have a distinctive name, character, and use, with markedly different chemical characteristics from either the naturally occurring RNA or any continuous DNA sequence found on the chromosome. The claimed isolated cDNA sequences are the creation of man, made using biological tools and the naturally occurring mRNA as a template. cDNA is therefore not one of the “‘manifestations of ... nature, free to all men and reserved exclusively to none’ ” that falls outside of the patent system. Chakrabarty, 447 U.S. at 309, 100 S.Ct. 2204 (quoting Funk Bros., 333 U.S. at 130, 68 S.Ct. 440). I decline to extend the laws of nature exception to reach entirely manmade sequences of isolated DNA, even if those sequences are inspired by a natural template. I therefore join the majority opinion with respect to the claims to cDNA sequences.[2]
DNA sequences that have the same pattern of DNA bases as a natural gene, in whole or in part, present a more difficult issue. Unlike the isolated cDNA molecules, whose sequence is not present in nature, these kinds of isolated DNA claims include nucleotide sequences which are found in the human body, albeit as part of a much larger molecule, the chromosome. The majority analysis focuses on the “markedly different chemical structure” of isolated DNAs, as compared to the corresponding native DNA. Majority at 1353. Although the different chemical structure *1365 does suggest that claimed DNA is not a product of nature, I do not think this difference alone necessarily makes isolated DNA so “markedly different,” Chakrabarty, 447 U.S. at 310, 100 S.Ct. 2204, from chromosomal DNA so as to be per se patentable subject matter. Cf. Funk Bros., 333 U.S. at 130-31, 68 S.Ct. 440 (Creation of “a new and different composition” of bacterial strains was nevertheless not patentable subject matter).
Given the chemical differences highlighted by Judge Lourie’s opinion and discussed supra, the mere fact that the larger chromosomal polymer includes the same sequence of nucleotides as the smaller isolated DNA is not enough to make it per se a law of nature and remove it from the scope of patentable subject matter. The actual molecules claimed in this case are therefore not squarely analogous to unpatentable minerals, created by nature without the assistance of man. Instead, the claimed isolated DNA molecules, which are truncations (with different ends) of the naturally occurring DNA found as part of the chromosome in nature, are not naturally produced without the intervention of man. Cf. Chakrabarty, 447 U.S. at 312-13, 100 S.Ct. 2204.
Given the differences, we should, as precedent instructs, consider whether these differences impart a new utility which makes the molecules markedly different from nature. I begin with the short isolated sequences such as those covered by claim 5 which is directed to “an isolated DNA having at least 15 nucleotides of the DNA of claim 1.” This claim covers a sequence as short as 15 nucleotides and arguably as long as the entire gene. For this claim to be patent eligible, all of the sequences ranging from the 15 nucleotide sequence to the full gene must be patentable subject matter. The shorter isolated DNA sequences have a variety of applications and uses in isolation that are new and distinct as compared to the sequence as it occurs in nature. For example, these sequences can be used as primers in a diagnostic screening process to detect gene mutations. These smaller isolated DNA sequences — including isolated radiolabeled sequences mirroring those on the chromosome — can also be used as the basis for probes. Naturally occurring DNA cannot be used to accomplish these same goals. Unlike the isolated DNA, naturally occurring DNA simply does not have the requisite chemical and physical properties needed to perform these functions.
The ability to use isolated DNA molecules as the basis for diagnostic genetic testing is clearly an “enlargement of the range of ... utility” as compared to nature. Funk Bros., 333 U.S. at 131, 68 S.Ct. 440. Indeed, many of the plaintiffs in this case submitted declarations indicating that they wanted to either offer such testing or receive such testing. These new applications, of course, rely on physical properties devised by nature, namely the ability of a strand of DNA to specifically interact with a complementary strand. Diagnostic testing, however, is not a natural utility — the body does not naturally engage in this type of testing, and certainly does not do so with the shorter (non-naturally occurring) isolated DNA used by man. As such, the claimed DNA does not “serve the ends nature originally provided.” Id. Instead, the isolated DNA sequences have markedly different properties which are directly responsible for their new and significant utility. Chakrabarty, 447 U.S. at 309-10, 100 S.Ct. 2204. The same sequence, as it appears in nature as part of the chromosome, simply cannot be used in the same way. Because the different chemical structure of the isolated DNA, which is a product of the intervention of man, leads to a different and beneficial utility, I believe small, isolated DNA fragments are patentable subject matter.
*1366 In fact, much of the dissent’s analysis with regard to the full gene would seem to support my conclusion that small isolated DNA molecules are directed to patent-eligible subject matter. The dissent explains why the baseball bat is directed to patent eligible subject matter: “man has defined the parts that are to be retained and the parts that are to be discarded. The result of the process of selection is a product with a function that is entirely different from that of the raw material from which it was obtained.” Dissent at 1377. The exact same thing is true with regard to primer and probe claims. Man has whittled the chromosomal DNA molecule down to a 15 nucleotide sequence— defining the parts to be retained and discarded. And the result is a product with a function (primer or probe) that is entirely different from the full gene from which it was obtained.[3] I conclude that the small, isolated DNA molecules, are an alteration of the natural product “with markedly different characteristics from any found in nature and one having the potential for significant utility.” Chakrabarty, 447 U.S. at 310, 100 S.Ct. 2204.
Longer strands of isolated DNA, in particular isolated strands which include most or all of the entire gene, are a much closer case. Some of the claims at issue, for example '282 patent claim 5, are genus claims, drafted broadly enough to include both short fragments as well as the entire isolated gene sequence. As discussed above, I believe many species within this genus — the shorter isolated DNA fragments — are clearly patentable subject matter based on their new structure and corresponding enlarged range of utility. Yet that still leaves species that include most or all of the isolated gene sequence. While I ultimately conclude that these longer isolated sequences, including the isolated gene sequence as a whole, are also patentable subject matter, I do so for a reason different than for the shorter sequences.
All of the same structural arguments apply to any length of isolated DNA so, like the shorter strands, an isolated DNA coding for a gene does have a literal chemical difference from the gene as it appears on the chromosome. Different ends in a 15 nucleotide sequence have greater significance than different ends in a 6000 nucleotide sequence. Unlike the shorter strands of isolated DNA, the chemical and structural differences in the isolated gene do not clearly lead to an “enlargement of the range of ... utility” as compared to nature. Funk Bros., 333 U.S. at 131, 68 S.Ct. 440. For example, the full length gene is too large to be used as a probe. See J.A. 4322 (a probe is a DNA molecule usually 100-1,000 bases long). Likewise, an entire isolated gene appears unsuitable for use as a primer in genetic screening for mutations in that same gene. See J.A. 4323 (Primers “are complementary to an exact location of a much larger target DNA molecule.” (emphasis added)). As such, the chemical and structural differences in an isolated DNA sequence which includes most or all of a gene do not clearly lead to significant new utility as compared to nature. Whether an isolated gene is patentable subject matter depends on how much weight is allocated to the different structure as compared to the similarity of the function to nature.
If I were deciding this case on a blank canvas, I might conclude that an isolated DNA sequence that includes most or all of a gene is not patentable subject matter. *1367 Despite the literal chemical difference, the isolated full length gene does not clearly have a new utility and appears to simply serve the same ends devised by nature, namely to act as a gene encoding a protein sequence. This case, however, comes to us with a substantial historical background. Congress has, for centuries, authorized an expansive scope of patentable subject matter. Likewise, the United States Patent Office has allowed patents on isolated DNA sequences for decades, and, more generally, has allowed patents on purified natural products for centuries. There are now thousands of patents with claims to isolated DNA, and some unknown (but certainly large) number of patents to purified natural products or fragments thereof.[4] As I explain below, I believe we must be particularly wary of expanding the judicial exception to patentable subject matter where both settled expectations and extensive property rights are involved. Combined with my belief that we should defer to Congress, these settled expectations tip the scale in favor of patentability.[5]
IV.
For more than a decade the Patent Office’s policy has been that “[a]n isolated and purified DNA molecule that has the same sequence as a naturally occurring gene is eligible for a patent because ... that DNA molecule does not occur in that isolated form in nature.... ” 66 Fed.Reg. 1092, 1093 (Jan. 5, 2001). The explicit statement of the Patent Office’s position on isolated DNA, however, is simply a continuation of a longstanding and consistent policy of allowing patents for isolated natural products. See id. (noting U.S. Patent 141,072, claiming “[yjeast, free from organic germs of disease,” issued to Louis Pasteur in 1873); cf. In re Bergstrom, 57 CCPA 1240, 427 F.2d 1394 (1970) (isolated prostaglandins patentable). According to the Patent Office, isolated DNA is no different from the isolated natural products of Parke-Davis. See 66 Fed.Reg. at 1093 (quoting Parke-Davis).
Even before the current guidelines formalized the Patent Office’s position, however, it granted patents to human genes in the early 1980s, and subsequently issued thousands of patents on “isolated DNA.” Majority at 1354-55. In fact, claims similar to the ones at issue in this case have been the focal point of important litigation. For example, Amgen, Inc. v. Chugai Pharmaceutical Co., 927 F.2d 1200 (Fed.Cir.1991), involved a claim to “ ‘[a] purified and isolated DNA sequence consisting essentially of a DNA sequence encoding human erythropoietin.’” Id. at 1203-04 (quoting U.S. Patent No. 4,703,008, claim 2). We affirmed that this claim was valid and infringed. Id. at 1219. Erythropoietin, also known as EPO, went on to become the *1368 biggest-selling biotechnology drug developed to that point, resulted in billions of dollars in sales, and accounted for over 50% of Amgen’s revenue in 1997. Amgen, Inc. v. Hoechst Manon Roussel, Inc., 126 F.Supp.2d 69, 77 (D.Mass.2001). Isolated DNA claims, at least in the case of Amgen, represent crucial and exceedingly valuable property rights.
The settled expectations of the biotechnology industry — not to mention the thousands of issued patents — cannot be taken lightly and deserve deference. This outpouring of scientific creativity, spurred by the patent system, reflects a substantial investment of time and money by the biotechnology industry to obtain property rights related to DNA sequences. The type of fundamental alteration in the scope of patentable subject matter argued in this case “risk[s] destroying the legitimate expectations of inventors in their property.” Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722, 739, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002). I believe leaving intact the settled expectations of property owners is particularly important in light of the large number of property rights involved, both to isolated DNA and to purified natural products generally.
The Supreme Court has warned that “courts must be cautious before adopting changes that disrupt the settled expectations of the inventing community.” Festo, 535 U.S. at 739, 122 S.Ct. 1831. The settled expectations of the inventing community with respect to isolated DNA claims are built upon the broad language of the statute, judicial precedent, such as ParkeDavis and Merck, and the Patent Office’s longstanding policy and practice. Neither Funk Brothers nor Chakrabarty purported to overrule either the early cases or the Patent Office’s practice; indeed, as discussed supra, these cases weigh the same considerations as Parke-Davis and Merck. “ ‘To change so substantially the rules of the game now,’ ” after more than a century of practice, “ ‘could very well subvert the various balances the PTO sought to strike when issuing the numerous patents which have not yet expired and which would be affected by our decision.’ ” Festo, 535 U.S. at 739, 122 S.Ct. 1831 (quoting Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 32 n. 6, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997)).
Although the Patent Office has consistently followed the same policy for a decade (and arguably a century or more), the United States, as an amicus represented at argument by the Solicitor General, now argues that the Patent Office’s published guidelines are incorrect and a misstatement of the law. In place of these guidelines, the Solicitor General suggested that we should use a “magic microscope” as part of our section 101 analysis. If we could observe the claimed substance in nature using this microscope, the Solicitor General argues, it is not patentable. The magic microscope test applies equally to portions of a larger, naturally occurring molecule. For example, the optical field of view could be zoomed to see just a sequence of fifteen nucleotides within the chromosome. As long as you could “see” the claimed molecule in nature using the magic microscope, it would fall into the “laws of nature” exception and be unpatentable subject matter.
Certainly the magic microscope has curb appeal — its child-like simplicity an apparent virtue. The magic microscope, however, would not see the claimed DNA molecules at issue in this case. An isolated DNA molecule has different chemical bonds as compared to the “unisolated” sequence in the chromosome (the ends are different). In short, the claimed molecules cannot be seen in nature through the magic microscope. While you may be able to see the order of DNA nucleotides in the chromosome, the isolated fragment of *1369 DNA is a different molecule. It may be that the microscope can also break and form chemical bonds to yield the claimed isolated DNA. Even so, the microscope must make some decisions: should the isolated DNA begin and end in a phosphate? a hydrogen? a hydroxyl? a methyl group? an acyl group? These decisions might be obvious to a person of ordinary skill in the art, but they are not inherent to the unisolated sequence as part of the chromosome. Creating the claimed isolated DNA sequences therefore results in a distinctly unnatural molecule.[6] Even the dissent agrees that the isolated DNA molecules at issue require cleaving chemical bonds, though it disputes the importance of the resulting distinct “ ‘molecular species.’ ” Dissent at 1375 (quoting Linus Pauling, The Nature of the Chemical Bond 6 (3d ed.1960)). The magic microscope test simply does not work the way the government claims.
While the magic microscope creates a bright line rule, it presents a poorly defined question: can we “see” the claimed molecule, or something fairly similar, in nature? Even if the scientific imprecision of the test were excusable, the government also asks us to do away with Chakrabarty’s flexible inquiry as to whether the invention, as claimed, has “markedly different characteristics from any found in nature” which result in “the potential for significant utility.” Id. at 310, 100 S.Ct. 2204. Indeed, the bright line magic microscope test actually appears to be contrary to Funk Brothers, since the combination of bacteria in that case was a “new and different composition of non-inhibitive strains,” 333 U.S. at 130-31, 68 S.Ct. 440, and therefore not actually present in nature. There may be additional nuance in the government’s argument that accounts for this inconsistency, but under my understanding of the magic microscope test, the combination in Funk Brothers would be patentable subject matter.
Indeed, the government does not apply its own understanding of section 101 consistently. In its brief, the United States explains that “[a] chemical alteration of a bioactive molecule to improve absorption by the body ... would likely satisfy section 101.” United States Amicus Br. 31 n. 8. As discussed supra, the isolated DNA molecules at issue in this case are the result of a “chemical alteration of a bioactive molecule” that leads to different properties, including a dramatic reduction in size. Just as the government’s theoretical “chemical alteration” leads to a molecule with improved absorption properties, the isolation of discrete DNA sequences changes the properties of the sequence as compared to the chromosomal DNA. This is not “[mjerely sorting the proverbial wheat from the chaff,” id., but the creation of new DNA molecules with distinct properties and additional utility, including the ability to be used as a primer in genetic testing.[7]
*1370 Also troubling is the apparent lack of awareness about the impact of the proposed test. The government asserts that the magic microscope “is a very limited position”; the government is wrong. This test cannot be limited to DNA by either legal or scientific principles. For example, Louis Pasteur’s 1873 claim to “Yeast, free from organic germs of disease, as an article of manufacture” runs afoul of the magic microscope since the microscope could zoom in to see that yeast free from contaminants. Similarly, isolated naturally occurring molecules long considered patentable subject matter, including adrenaline, vitamin B-12, and prostaglandins, would also fall outside the scope of section 101. Although the powers of the magic microscope are not entirely clear, it appears that patents to smaller fragments of naturally occurring molecules, for example claims to truncated proteins (see, e.g., U.S. Patent No. 4,762,914, entitled “Truncated Protein of Interleukin-1”), would also be unpatentable.
The government’s new test fundamentally changes more than a century of precedent and Patent Office practice in the pharmaceutical and biotechnology arena. The proposed test is a purely mechanical inquiry that fails to account for the possibility that chemical changes to the isolated DNA sequences at issue, as compared to their natural state, could result in markedly different uses. As such, the government’s position in this case calls into question the validity of an unknown number of patents and claims and upsets the settled expectations of some of our most innovative industries. This is not a “very limited position.”
The dissent claims that the Patent Office’s past views are “substantially undermined by the position the government has taken in this case.” Dissent at 1380. The Patent Office’s prior practice, however, is particularly important since it resulted in a large number of property rights over the past decades. If the Executive decided to change course in the Patent Office, and decline to issue new patents to isolated genes, it would not impact these existing property rights. This, however, is not what the Executive argues in this ease. Instead the Solicitor General argues for an entirely different interpretation of the law that would destroy existing property rights. Although the dissent points out that Chakrabarty overturned the Patent Office’s practice of denying patents to microorganisms, there is a clear difference between allowing additional patent protection where none previously existed, and denying patent protection decades (or centuries) after the fact, thereby eliminating a large number of property rights. Moreover, Chakrabarty, consistent with the broad language of the statute, allowed additional patents where none previously existed. Here, the Solicitor General proposes to destroy existing property rights based on a judge made exception to that same broad language. This is a dramatic step that I believe is best left to the legislature.
Nevertheless, the Solicitor General claims that “this is a pure question of law” and that we can therefore feel free to ignore the years of Patent Office practice and the accompanying expectations that practice created within the industry. The Solicitor General argues that we should not defer to the broad language (all but unchanged since 1793) provided by Congress in the patent statute, or allow Con *1371 gress to decide whether it is necessary to correct the Patent Office’s practice through legislation. It is tempting to use our judicial power in this fashion, especially when the patents in question raise substantial moral and ethical issues related to awarding a property right to isolated portions of human DNA — the very thing that makes us humans, and not chimpanzees.
The Solicitor General’s invitation is tempting, but I must decline the opportunity to act where Congress remains silent. “[0]ur obligation is to take statutes as we find them____” Chakrabarty, 447 U.S. at 315, 100 S.Ct. 2204. With respect to section 101, “[t]he subject-matter provisions of the patent law have been cast in broad terms to fulfill the constitutional and statutory goal of promoting ‘the Progress of Science and the useful Arts’....” Id. Any judicial exception to the statute’s broad language must be applied with care lest the courts usurp Congress’s constitutionally mandated authority to promote science and useful arts. Judicial restraint is particularly important here because an entire industry developed in the decades since the Patent Office first granted patents to isolated DNA. Disturbing the biotechnology industry’s settled expectations now risks impeding, not promoting, innovation.
Regardless, the judiciary is ill-suited to determine whether the claims at issue promote or inhibit science and useful arts in all but the clearest cases, for example a new mineral discovered in the earth, or a new plant found in the wild, or E=mc[2], or the law of gravity. Instead, I leave it to Congress, who “has the constitutional authority and the institutional ability to accommodate fully the varied permutations of competing interests that are inevitably implicated by such new technology,” Sony Corp. of America v. Universal City Studios, Inc., 464 U.S. 417, 431, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984), to decide whether it is necessary to change the scope of section 101 to exclude the kind of isolated DNA claims at issue here. “[UJntil Congress takes such action, this [ejourt must construe the language of § 101 as it is.” Chakrabarty, 447 U.S. at 318, 100 S.Ct. 2204. Section 101 is, on its face, broad enough to include the claims to isolated DNA at issue here.
The dissent suggests that “this may well be one of those instances in which ‘too much patent protection can impede rather than “promote the Progress of Science and useful Arts.” ’ ” Dissent at 1380 (quoting Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 548 U.S. 124, 126, 126 S.Ct. 2921, 165 L.Ed.2d 399 (2006) (Breyer, J., dissenting from dismissal of writ as improvidently granted)). Yet the biotechnology industry is among our most innovative, and isolated gene patents, including the patents in suit, have existed for decades with no evidence of ill effects on innovation. See David E. Adelman & Kathryn L. DeAngelis, Patent Metrics: The Mismeasure of Innovation in the Biotech Patent Debate, 85 Tex. L.Rev. 1677, 1681 (2007) (“The existing empirical studies find few clear signs that the patenting of biotechnology inventions is adversely affecting biomedical innovation.”); id. at 1729 (concluding “that overall biotechnology innovation is not being impaired by the growth in patents issued”). Changing course years after the fact will only serve to punish those companies who made the reasonable decision to invest large amounts of time and money into the identification, isolation, and characterization of genes. Unsettling the expectations of the biotechnology industry now, based on nothing more than unsupported supposition, strikes me as far more likely to impede the progress of science and useful arts than advance it. Given the complicated technology and conflicting incentives at issue here, any change must come from Congress. See Gottschalk v. Benson, 409 U.S. 63, 72-73, 93 S.Ct. 253, *1372 34 L.Ed.2d 273 (1972) (A section 101 analysis raises “considerable problems ... which only committees of Congress can manage, for broad powers of investigation are needed, including hearings which canvass the wide variety of views which those operating in this field entertain. The technological problems tendered [by the parties] ... indicate to us that considered action by the Congress is needed.”).
In fact, Congress has at least implicitly approved of the Patent Office’s policy of awarding patents on genes and DNA sequences. For example, Congress included, as part of the Patent Office’s appropriations, language affirming the Patent Office’s interpretation of section 101 to prohibit patents on human organisms. Consolidated Appropriations Act, 2004, Pub.L. No. 108-199, § 634, 118 Stat. 3, 101. Although Congress was aware “that there are many institutions ... that have extensive patents on human genes,” 149 Cong. Rec. H7248, H7274, it explicitly declined to implement legislation to “affect any of those current existing patents.” Id. (statement of Mr. Weldon introducing amendment). To the contrary, it made clear that the language related to “human organisms” was not intended to change the Patent Office’s policy with respect to claims to genes, stem cells, or other similar inventions. Id.[8] Far from oblivious to the patenting of genes, members of Congress previously introduced bills which would put a moratorium on gene patents,[9] authorize funding for the study of whether genes ought to be patentable,[10] and exempt from patent infringement anyone who uses patented genes for non-commercial research purposes or medical practitioners who use genetic diagnostic tests.[11] None of these became law. Congress is obviously aware of the issues presented in this case and I believe “[a]ny recalibration of the standard of [patentability] remains in its hands.” Microsoft Corp. v. i4i Ltd., — U.S. —, 131 S.Ct. 2238, 2252, 180 L.Ed.2d 131 (2011).
This case typifies an observation by the late Chief Judge Markey, our first Chief Judge, that “[o]nly God works from nothing. Men must work with old elements.” Fromson v. Advance Offset Plate, Inc., 755 F.2d 1549, 1556 n. 3 (Fed.Cir.1985) (quotation, citations omitted). Human DNA is, for better or worse, one of the old elements bequeathed to men to use in their work. The patents in this case revealed a new molecular understanding about ourselves; “the inventions most benefiting mankind are those that ‘push back the frontiers of chemistry, physics, and the like.’ ” Chakraharty, 447 U.S. at 316, 100 *1373 S.Ct. 2204 (quoting Great A. & P. Tea Co. v. Supermarket Corp., 340 U.S. 147, 154, 71 S.Ct. 127, 95 L.Ed. 162 (1950)). We cannot, after decades of patents and judicial precedent, now call human DNA fruit from the poisonous tree, and punish those inquisitive enough to investigate, isolate, and patent it. “Our task ... is the narrow one of determining what Congress meant by the words it used in the statute; once that is done our powers are exhausted.” Id. at 318, 100 S.Ct. 2204. This inquiry does not have moral, ethical, or theological components. Cf. id. at 316-17, 100 S.Ct. 2204 (“[W]e are without competence to entertain” arguments about “the grave risks” generated by genetic research.). The patents in this case might well deserve to be excluded from the patent system, but that is a debate for Congress to resolve. I therefore decline to extend the “laws of nature” exception to include isolated DNA sequences.

. The Patent Act of 1952 was the first time patentable subject matter (the current section 101) was separated out from novelty (the current section 102). Previously, these two concepts were combined into a single section.

. To the extent the claims to shorter portions of cDNA include only naturally occurring sequences found in the chromosome, for exam-pie claim 6 of the '282 patent, my reasoning is the same as for the isolated sequences of claim 5, discussed below.

. The dissent analogizes the full BRCA gene to a slab of marble found in the earth as distinct from the sculpture carved into it, which the dissent indicates would be worthy of intellectual property protection. If the multi-thousand nucleotide BRCA gene is the slab, isn’t the 15 nucleotide primer the sculpture?

. See, e.g., U.S. Patent 3,067,099 (claiming vancomycin, an antibiotic produced by bacteria found in soil) and U.S. Patent 4,552,701 (claiming a vancomycin fragment produced by removing a sugar unit). A natural product fragment, for example a naturally occurring antibiotic with a sugar moiety removed, is highly analogous to isolated DNA. In each case, the claimed molecule is a smaller fragment of a naturally occurring molecule, with some naturally occurring functionality removed. See U.S. Patent 4,552,701, col.3-4 (compare entry 2 with entries 10 and 13).

. My analysis of the claims at issue assumes that they do not include an isolated, full length chromosome. I do not believe that a claim to an entire chromosome, for example chromosome 17, is patentable subject matter. First, there is no indication that the chromosome in isolation has markedly different characteristics compared to the chromosome in nature. Second, unlike claims to isolated genes, there is no indication of either settled expectations or extensive property rights for claims to isolated chromosomes. This is undoubtedly due to the small number of chromosomes as compared to the number of genes.

. This also illustrates why the government's analogies to situations dealing with elements, for example lithium, are inapposite. Even assuming the government’s contention that lithium does not exist in isolated form in nature, it is nevertheless clear that elemental lithium, a basic building block provided by nature, at some point must have reacted with, e.g., water to form the naturally occurring lithium salts. In contrast, an isolated DNA sequence did not necessarily exist before reacting further to produce the corresponding naturally occurring chromosomal DNA. Unlike a lithium salt, the chromosome does not imply that an isolated DNA molecule of 15 nucleotides — or even a gene — necessarily previously existed as an isolated molecule in nature.

. The government’s position may be that adding functionality to a naturally occurring molecule, for example adding a lipid chain, is a creation of man while removing functionality, for example truncating a natural DNA sequence or protein to yield smaller molecules *1370 with new properties, is not. Scientifically, this distinction makes little sense: in either case, it is the intervention of man that created a new molecule. After all, the hand of man is just as apparent in the David, created by removing stone from a block of marble, as the ceiling of the Sistine Chapel, created by adding layers of paint to an existing structure.

. See also 149 Cong. Rec. E2417-01 ("What I want to point out is that the U.S. Patent Office has already issued patents on genes, stem cells, animals with human genes, and a host of non-biologic products used by humans, but it has not issued patents on claims directed to human organisms, including human embryos and fetuses. My amendment would not affect the former, but would simply affirm the latter.”) (emphasis added) (statement of Mr. Weldon after amendment approved); see also 157 Cong. Rec. El 177-04 (resubmitting this testimony in the context of the current patent reform legislation).

. At least one bill was introduced in Congress to put a moratorium on patents to human genes or gene sequences. See, e.g., The Animal and Gene Patent Moratorium Bill (S.387 1993).

. The Genomic Science and Technology Innovation Act of 2002 (H.R. 3966).

. The Genomic Research and Diagnostic Accessibility Act of 2002 (H.R. 3967). As the bill's sponsor explained: “It is important to note that this section would not overturn the commercial rights of patent holders. If a research [organization] utilizing the exemption makes a commercially viable finding, he or she would still have to negotiate any rights to market the new discovery with the patent holder.” 148 Cong. Rec. E353-03.

. Although I recognize that Judge Lourie and Judge Moore, while reaching the same ultimate conclusions, have taken analytical paths that differ in some respects, for convenience I will refer to Judge Lourie's opinion as the majority opinion and Judge Moore's opinion as the concurring opinion.